M41KCITC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   S.M., A Minor By Her Next
    Friend, ALISON KING,
4
                    Plaintiff,
5
            v.                          20 CV 5164 (JPO)
6                                       Remote Conference
    CITY OF NEW YORK, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        April 1, 2022
10                                      10:30 a.m.

11  Before:

12                      HON. J. PAUL OETKEN,

13                                      District Judge

14                          APPEARANCES

15  KIRKLAND & ELLIS LLP
         Attorneys for Plaintiff
16  BY:  STEPHANIE MICHELLE SHIMADA
         JEEHYEON LEE
17       RACHEL MARIE FRITZLER

18  GEORGIA M. PESTANA
         Corporation Counsel of the City of New York
19  BY:  MARK GALEN TOEWS
         Assistant Corporation Counsel
20
    RUTHERFORD & CHRISTIE LLP
21       Attorneys for Defendant Good Shepherd Services
    BY:  DAVID SCOTT RUTHERFORD
22

23

24

25

M41KCITC

1          (The Court and all parties appearing remotely)

2          (Case called)

3          THE COURT:  For the record, would each of you please

4     state your names, starting with counsel for plaintiff.

5          MS. SHIMADA:  Hello.  This is Stephanie Shimada, from

6     Kirkland & Ellis.

7          MR. TOEWS:  Good morning.  This is Mark Toews, with

8     the Corporation Counsel's Office, representing the City of New

9     York.

10          MR. RUTHERFORD:  Good morning.  David Rutherford,

11     Rutherford & Christie, representing Good Shepherd Services.

12          THE COURT:  Good morning.  This is Judge Oetken, and,

13     again, please state your name each time you speak since there's

14     a court reporter taking this down.

15          I scheduled this call as a result of letters I

16     received, first from the plaintiff addressing discovery by Good

17     Shepherd, and then there's another letter that was filed on the

18     29th about the city's response to discovery.  So I just wanted

19     to address any disputes.

20          I'll note that I extended the fact discovery deadline

21     to April 28th, which is fast approaching.

22          Let me start, Ms. Shimada, have any depositions taken

23     place yet?

24          MS. SHIMADA:  No, your Honor, none has.

25          THE COURT:  Let's start the letter of, I guess,

1    March 18th from plaintiff.  There is a response which basically

2    says we produced what we have.

3         Why don't you start, Ms. Shimada, and tell me what it

4    is you feel, as to Good Shepherd first, you're lacking.

5         MS. SHIMADA:  So, for Good Shepherd, your Honor, I

6    think there are a couple of issues that might be summarily

7    addressed in our letter that may no longer be issues based on

8    Good Shepherd's response on March 21st, and those are questions

9    about the identities of the relevant Good Shepherd employees

10   and our question about the whereabouts of Dr. Port's notes.

11        We understand that Mr. Rutherford, as represented by

12   Good Shepherd, has given us all of the names of the relevant

13   employees and that they have done a good search for the notes

14   and have not found those.  So, while we may address those

15   further at depositions, I don't think we need to do anything

16   with those today.

17        The outstanding issues, however, we think, are three:

18        There is the one overarching issue that plaintiff has

19   not received any emails or communications from Good Shepherd,

20   the second one is that we have not received any documents or

21   communications after September 6, 2019, when we had asked for

22   them through July 2020, and the third issue is that we have

23   asked for the names of the minors who have bullied the

24   plaintiff at Euphrasian, but given in an anonymized form, such

25   as Student A or Youth A, and we have not received that either.

M41KCITC

1          THE COURT:  All right.  So, Mr. Rutherford, would you

2     address those three points starting with the email?

3          MR. RUTHERFORD:  Sure.

4          I have some good news on that front.  We have found

5     the emails.  When plaintiff filed their letter, I requested my

6     client -- despite the fact that they had made three different

7     searches, I asked them to have a completely new person put on

8     it and do a top-to-bottom search, and, for whatever reason, he

9     has found these emails.  So I am not in the office — I haven't

10     been in all week — but I will receive those on Monday, look at

11     them, and get them all to counsel for plaintiff next week.

12          On the second issue --

13          THE COURT:  Before you go on to the second issue, let

14     me confirm, when you say the emails, what search criteria was

15     used?

16          MR. RUTHERFORD:  We used the plaintiff's name, we used

17     the plaintiff's father's name, we used the ACS number, we used

18     anything we could find that might bring these up.

19          Now, why they weren't brought up in our initial

20     searches, I don't know that, but I will speak to the IT person

21     who found them, I think, a couple of days ago, and figure out

22     what he did differently than the other people didn't do the

23     first time, but I can assure you, we've had several

24     meet-and-confers, and each time we've gone back and redid this.

25     I don't know whether they're not sophisticated — I don't know —

M41KCITC

1    but I can represent to the Court that the emails involving the

2    plaintiff have been found, and they will be produced next week.

3            THE COURT:  All right.

4            What about the date issue?

5            MR. RUTHERFORD:  I don't believe that that is true.

6    The Connections records -- let me back up.

7            There's an electronic file that both ACS and Good

8    Shepherd have access to, which is called Connections, and it's

9    basically the foster care system electronic records system that

10   is used throughout the state.  The entire record for the entire

11   time, I believe, has been produced to the plaintiff.  I don't

12   think that what the plaintiff said to you is accurate.  I think

13   we had produced or the city has produced the entirety of the

14   Connections records going to the full date that they're talking

15   about.

16           THE COURT:  Mr. Toews, do you have any insight into

17   that?

18           MR. TOEWS:  Yes, your Honor.  Mark Toews, here for the

19   city.

20           What Mr. Rutherford says is correct.  I know this

21   issue will come up when plaintiff -- I assume it will come up

22   when plaintiff addresses their concerns with respect to the

23   city's production.

24           We haven't provided the Connections file.  The

25   Connections file really documents every single interaction,

M41KCITC

exchange, communication regarding the plaintiff with ACS, and,
as Mr. Rutherford said, I believe Good Shepherd has access to
that.  This is something we do as a matter of course in these
types of cases — we always provide the Connections file, which
is, again, the electronic record relating to every interaction
that ACS has with the plaintiff.  So I believe it's complete.

          THE COURT:  Can you confirm that there was no cutoff
of September 2019, but it went all the way through July 2020?

          MR. TOEWS:  You know, I can open it up right now.
That's not something I looked into last night when I was
preparing for today because I don't think the plaintiffs took
issue, necessarily, with the Connections production as far as
the city, but I can do that literally right now, but I believe
it's —— I don't believe there is any cutoff, but let me open up
the file right now.

          THE COURT:  Okay.  We'll get back to it when we get to
the city.

          But, Ms. Shimada, is it the Connections file documents
that you contend were arbitrarily cut off on September 6th or
some other set of documents?

          MS. SHIMADA:  I think it's the production in full,
your Honor.  The Connections file that was produced by Good
Shepherd, I believe, did have that cutoff as September 2019.
And so while the city did produce, I believe, through the
July 2020 time frame, we are not sure whether or not that's

M41KCITC

1  exactly the same information that Good Shepherd has and whether

2  it's stored in the same way, and we'd also want to make sure

3  that any email communications that are being produced also

4  extend through that July 2020 date.

5          MR. RUTHERFORD:  Yes.  This is David Rutherford.

6          The Connections file is the same file that Good

7  Shepherd and the city would have.  There would be no difference

8  in the Connections file.

9          And the emails, I am producing any email that

10 references the plaintiff, with no date cutoff.

11         THE COURT:  So you're not cutting off production as of

12 September 2019?

13         MR. RUTHERFORD:  No, no.  Just to clarify this, our

14 initial response had the earlier date, and then, when plaintiff

15 raised that they wanted through a later date, I believe by that

16 time, the Connections record had already been produced by the

17 city or, if it wasn't, it was produced shortly thereafter, and

18 that's the exact same record that the city and Good Shepherd

19 would have.

20         THE COURT:  All right.

21         What about the third, the issue of the anonymized

22 other children?

23         MR. RUTHERFORD:  So, on the records that we produced,

24 we redacted the names of any other foster care children, which

25 we are bound by law, by both federal law and New York State

M41KCITC

law, from keeping the identities of any other children in

foster care have to be redacted, and that is done as a matter

of course, and that's been done for I don't know how many

years.  In fact, it's required in filings made through ECF.

So, I can't provide those names.  What the plaintiff

has is, there's redactions, and I believe we're proper on that,

and, by law, I can't do anything more, and I've expressed that

to the plaintiff, and I don't know what else to say about that.

THE COURT:  Ms. Shimada?

MS. SHIMADA:  We think there might have been some

miscommunication here just because we're not asking for the

names to be given to us.  We understand that there is a need to

protect the identity of these minors.  However, what we would

like is some way that we can refer to these unique individuals

whose names were redacted or whose names were not disclosed in

response to our interrogatory responses, for example, so that

we can depose the relevant individuals about these students,

using their anonymized names.

Right now, as it stands, we just have no idea how many

individuals' names were redacted or how many individuals were

identified by Good Shepherd and not disclosed in interrogatory

responses.

THE COURT:  You're looking for -- it sounds like

everyone needs to agree on some code, like person one, person

two --

M41KCITC

1          MS. SHIMADA:  Exactly, your Honor, that would be very

2     helpful.

3          THE COURT:  Is that something that you all can work

4     out, Mr. Rutherford?

5          MR. RUTHERFORD:  As long as there's no way to identify

6     these people, I don't conceptually have a problem with that,

7     but there can be no identifying information given.

8          THE COURT:  Understood.

9          It just seems to be -- this might be something you

10    have to get out at depositions.  When you're speaking with

11    people, you might just have to come up with some agreed-upon

12    system of referring to particular people, you know, incident on

13    X date where XY happened, you know, the person involved was

14    Person 5 or whatever.  It just seems you're going to have to

15    confer with the fact witnesses --

16          MR. RUTHERFORD:  Deponents.

17          THE COURT:  Yes, the deponents.

18          So I'll direct you all to communicate about that and

19    try to work something out.

20          What about the city?  I'm not sure this is right.

21    Mr. Toews, are you in a position to respond to the points

22    raised in plaintiff's letter about the city's production?

23          MR. TOEWS:  I can respond, your Honor, yes.

24          THE COURT:  Ms. Shimada, do you want to start by

25    highlighting what issues remain?

M41KCITC

1          MS. SHIMADA:  I don't believe the city has submitted a

2     response letter, so we believe that all of the issues that we

3     raised in our letter of a few days ago are still remaining

4     before the Court.  So there are six different issues:

5          The first one is the same issue that we've addressed

6     with Good Shepherd, and it's that we have not received any

7     emails or communications from the city.

8          The second issue is that we've asked for the

9     production of ACS policies and procedures, and while we

10    received a few procedures, we have not received any documents

11    relating to the key issues here, for example, the policies

12    relating to the transfer and placement at Euphrasian or at a

13    therapeutic foster home.

14         The third issue is that we've asked for information on

15    the children's center's occupancy, and we have not received any

16    information on that yet.

17         The fourth is we've asked for information on the

18    plaintiff's family court records and ACS' engagement of Good

19    Shepherd.

20         The fifth is that we've asked for police records.

21         And the sixth is similar, that we have asked for the

22    identity of the relevant ACS employees, and while we received

23    one name, we believe that that response is incomplete.

24         THE COURT:  All right.

25         Starting with emails?

M41KCITC

1          MR. TOEWS:  Okay.  Yes, thank you, your Honor.  This

2    is Mark Toews again, representing the city.

3          So we have met and conferred on this issue with

4    plaintiffs, and the position that we have taken, from the

5    outset, is that most of the communication in these types of

6    cases, and this case in particular, is not over email, it's

7    face-to-face or telephone.  However, the limited emails that

8    have been sent are contained and summarized in detail.

9    Actually, I was going to say summarized, but they're detailed

10   in the Connections records.  So, again, this is the electronic

11   record that has been provided.

12         So there are a couple of emails, but each of the

13   emails is -- the contents of the email are in the Connections

14   records.  So what we said is, you already have the contents of

15   these emails.  If there are particular emails that, you know,

16   you think are missing or if there is an email from a particular

17   custodian that you want, tell us, and we can search for it.

18   But it seems that the burden outweighs the benefit here in

19   terms of searching for emails in this case because the emails

20   are contained within the records that we've already provided,

21   and I think the examples in plaintiff's motion kind of bear

22   this out.  There are three examples of emails that they say are

23   relevant.  One of them is from the plaintiff.  Others very

24   clearly explain what the email stated to ACS and how ACS

25   responded.  So that's our position on the emails.

M41KCITC

1          THE COURT:  Let me jump to number six.  They say

2    you've only given one ACS name.  I don't know how you can do a

3    full email production without a list of ACS custodians.

4          I assume, Ms. Shimada, are we talking basically about

5    ACS personnel here?

6          MS. SHIMADA:  Yes, that's right.  And we've noticed,

7    just from the limited emails that we do have from our own

8    clients' emails, which, of course, includes all internal

9    emails, that there are at least four different ACS employees

10   who have been communicating about our client.

11         MR. TOEWS:  Well, we've identified in our initial

12   disclosures the caseworker, and we've also identified a

13   30(b)(6) witness, which gets to one of the other issues that

14   plaintiff raised.

15         So, at this point, as counsel for plaintiff noted, no

16   depositions have taken place.  It's relatively --

17   unfortunately, because discovery has been open for quite some

18   time, no depositions have taken place.  The plaintiff hasn't

19   testified about any emails that she sent or any communications

20   or contact that she's had with ACS employees.  From my

21   investigation and speaking with my client, the people we've

22   identified are the central players in this case, which I should

23   note, I feel the city's involvement in this case, based upon

24   the Court's partial grants of our motion to dismiss, is

25   relatively limited.  It relates solely to the decision to place

M41KCITC

1    the plaintiff at Euphrasian and not anything to do with the

2    removal, which plaintiff has conceded, in the opposition to our

3    motion to dismiss, was proper.

4         So a lot of the records that plaintiff is seeking

5    relate to the investigation and the lead-up to plaintiff's

6    placement at Euphrasian, which, in my view, at this point, is

7    essentially irrelevant.

8         THE COURT:  Would you like to respond?

9         MS. SHIMADA:  Yes, your Honor.

10        What I think is problematic is that counsel for the

11   city has represented that he cannot produce emails unless we,

12   the plaintiff, can explain what these emails are and how

13   they're relevant, but, unfortunately, we're not the party that

14   has access to that information.  We do not know what even just

15   one individual who was identified by the city may have been

16   communicating about with respect to our client.  And we believe

17   that, given the claims in the complaint about the knowledge

18   that the city had when supervising plaintiff, about the

19   decisions that were made with respect to the plaintiff's care,

20   we're entitled to understand the city's thinking behind these

21   decisions, which would go beyond the summaries that are

22   contained in the Connections file, but would actually require

23   the communications between the relevant players.

24        THE COURT:  Remind me what remains of the claims

25   against the city.

M41KCITC

1          MS. SHIMADA:  The claims against the city, your Honor,

2     include both our state law claim, so we had a claim relating to

3     negligent supervision of the plaintiff while the plaintiff was

4     in Euphrasian's care, as well as our claims under 1983, your

5     Honor, relating to her placement at Euphrasian.

6          MR. TOEWS:  If I can just add to that, your Honor.

7     Just to be clear, the only --

8          THE COURT:  State your name.

9          MR. TOEWS:  I'm sorry, your Honor?

10          THE COURT:  State your name every time you speak.

11          MR. TOEWS:  I apologize.  This is Mark Toews,

12     representing the City of New York.

13          I just wanted to add that the only municipal defendant

14     here is the City of New York, and that was partially the basis

15     of our motion to dismiss.

16          The portion seeking dismissal of the city was denied,

17     I acknowledge, but in light of the fact that the city is the

18     only municipal defendant in the case, the only issue here is

19     the *Monell* claim in addition to the state law claims, but it's

20     really whether or not the city has an unconstitutional practice

21     or policy --

22          THE COURT:  No, we are doing discovery on the state

23     claims.

24          MR. TOEWS:  Yes, your Honor.

25          THE COURT:  They're part of the case.

M41KCITC

1          MR. TOEWS:  Agreed.  I agree.

2          THE COURT:  I mean, negligent supervision, you've

3     got -- this is regular discovery.  This is a claim against the

4     city, and you have the burden of showing anyone -- any emails

5     for her name of anyone who would have been involved in the

6     supervision -- the decision, but also the supervision of

7     Euphrasian and Good Shepherd.

8          I don't know, are there any particular -- Ms. Shimada,

9     is there anything, in particular, you're asking for in terms of

10    categories of people who would have been involved or what?

11    What is the ask here?

12         MS. SHIMADA:  I think it's a little bit hard right

13    now, your Honor, just because we only do know the identity of

14    the one individual who's disclosed.  But I think the emails

15    from that individual, Raven Herbert, would be very helpful here

16    to understand what Raven Herbert understood about S.M.'s

17    treatment at Euphrasian and how her involvement was in the

18    decisions that were made with respect to her treatment.

19         And one other thing that we noticed, also, from our

20    review of our own client's email is that there was a complaint

21    made by the plaintiff to somebody at the city, and she received

22    a response from someone named Shaquana Green at ACS, an ACS

23    Office of Advocacy individual, and that individual appeared to

24    be corresponding with the plaintiff regarding her complaints

25    about her treatment and placement at Euphrasian.  So any

1    similar communications with respect to the plaintiff's

2    complaints or internal communications about those complaints

3    would be very helpful here.

4         THE COURT:  Mr. Toews, can you gather those documents?

5         MR. TOEWS:  Well, I said I could respond to the

6    plaintiff's motion, and I feel I'm prepared to, but this is the

7    first I'm hearing of it.  So this is what we mentioned to the

8    plaintiffs during our last meet-and-confer, is that if they had

9    something specific that they were requesting, that they should

10   let us know.  So they can email me the name.  I think it was

11   Shaquana Green.  I could certainly look and see, absolutely.

12        THE COURT:  Two things:  I'm going to direct you to

13   actually do an email search of the caseworker for anything

14   relating to the plaintiff.  And, look, it might be that it all

15   ends up being duplicative of what's already in the record, but

16   I think you need to confirm that.

17        As to the new name, Shaquana Green, I want you to at

18   least do an inquiry and see if she has any relevant emails.

19   That's the only specific item which I'm granting the motion to

20   compel with respect to the email.

21        What about ACS policies and procedures?  That seems

22   something you definitely should produce.  Are there others that

23   you could identify that have not been produced yet?

24        MR. TOEWS:  No, not that I'm aware of, no.  We

25   supplemented our response.  We provided policies that ACS

M41KCITC

```
 1    provided to me that they've indicated are relevant.  We did

 2    identify a 30(b)(6) witness.  I haven't interviewed her yet

 3    because the deposition is not on the calendar.  I certainly

 4    will before we produce her, and if there's something additional

 5    that she identifies when I show her what's been produced, then

 6    we would certainly produce it in advance of the deposition,

 7    and, obviously, plaintiffs will have the opportunity to

 8    question her about whether or not there are additional policies

 9    that are relevant.

10            I think I would also just say, a lot of these

11    decisions are discretionary, so I think the deposition is going

12    to be important.  It's not an if-then scenario, I don't think,

13    in these cases; it's a discretionary decision about where to

14    make the placement.  So I think the deposition will be helpful,

15    but I think we provided a full response at this point.

16            THE COURT:  All right.

17            Ms. Shimada, anything else on that one?

18            MS. SHIMADA:  I don't think so, your Honor.

19            Of course, we'd like to talk to the city's 30(b)(6)

20    witness, and to the extent that the city is now representing

21    that they've produced all policies that are relevant and

22    they're able to find, I think we have all that we need, and we

23    can question the witness about whether or not there were any

24    other policies relating to Euphrasian or the children's center

25    that we have not received or whether or not it was a purely
```

M41KCITC

1    discretional decision.

2            THE COURT:  Number three is children's center

3    occupancy.

4            Mr. Toews?

5            MR. TOEWS:  Yes.

6            So, your Honor, we did provide an occupancy limit.  It

7    was slightly outside the time frame that when plaintiff was

8    housed at the children's center.  I asked ACS if they had

9    anything that was more relevant to the time period.  The answer

10   was, no, they haven't been able to locate anything.

11           Truthfully, I actually don't really see how it's

12   relevant.  Plaintiffs noted that we didn't object on relevance

13   grounds, and I double-checked, and that's correct, we did not

14   object on relevance grounds, but upon further reflection, I

15   actually don't really see how it's relevant.  The occupancy

16   limit of the children's center, the children's center is the

17   spot where kids who are temporarily removed from the custody of

18   their family are housed pending a more permanent or at least a

19   further placement, if not permanent.

20           The idea that the children's center was overcrowded

21   and that that led to a rushed decision to place the plaintiff

22   at Euphrasian, I think, is pretty speculative, and it's in the

23   complaint, but it's quite clear to me that it's not -- it

24   doesn't seem to be plaintiff's allegation.  Again, we have not

25   taken her deposition, so if she makes it an allegation that it

M41KCITC

1    was overcrowded, the children's center, that would be one

2    thing, but, again, we did provide a document that noted the

3    occupancy limit.  It was slightly before plaintiff's time

4    there, but I don't think there's any reason to think that the

5    physical location that I don't think has been -- it wasn't

6    renovated in the few months from the date that we provided the

7    documents to the time that plaintiff was housed there.

8            THE COURT:  Ms. Shimada, anything to add?

9            MS. SHIMADA:  Your Honor, we do think that this

10   information is relevant because, as Mr. Toews alluded to, one

11   of the claims that we made in our complaint is that the city

12   decided to move the plaintiff to Euphrasian, which was not

13   appropriate for her needs and not based on any evaluation of

14   what was best for the child, but was, instead, based solely on

15   issues that the city was having at the children's center.  So

16   we believe that this request for more information on the

17   operating certificates and on the monthly status updates for

18   the children's center are relevant.

19           While we received one ACS children's center monthly

20   status update, we requested additional ones and have not

21   received any.

22           THE COURT:  You're looking for children's center

23   occupancy numbers, or more information?

24           MS. SHIMADA:  We're looking for more information, your

25   Honor.  But what we did receive from the city is we received

M41KCITC

1    one operating certificate and one monthly children's center

2    monthly status update.  But because the operating certificate

3    was outside of the time frame, we were asking for one that was

4    within the time frame, as well as the additional monthly status

5    updates, which we believe should have been maintained monthly.

6         THE COURT:  Mr. Toews, can you provide the monthly

7    reports for the relevant period, including the time she was at

8    Euphrasian?

9         MR. TOEWS:  I can request it from ACS, your Honor.  We

10    discussed this issue with plaintiffs, and I did request it from

11    ACS.  They weren't able to locate it, but I don't think --

12         THE COURT:  I'm going to grant the motion as to the

13    monthly reports for the period she was either at children's

14    center or Euphrasian.

15         What about plaintiff's family court records,

16    Mr. Toews?

17         MR. TOEWS:  Yes, okay.  I was a little surprised to

18    see this in the motion because the Court, only a couple of days

19    ago, granted the authorization to unseal these.  So we've been

20    waiting for the authorizations for — I don't know, maybe

21    Mr. Rutherford can help me here — for many, many months.

22    Plaintiff provided some authorizations to Good Shepherd, but

23    didn't provide them to the city.  I don't understand why, but

24    they weren't provided to all defendants.

25         THE COURT:  So is this moot now, Ms. Shimada?

M41KCITC

1          MS. SHIMADA:  Yes, it is, your Honor, if what

2     Mr. Toews is saying is that now that there are the

3     authorizations, we can release these records.

4          THE COURT:  Okay.  Great.

5          Police records, what is it that you're looking for

6     here, Ms. Shimada?

7          MS. SHIMADA:  We believe that there were some

8     complaints that were made by the plaintiff to the New York

9     Police Department, and we've asked for any police records

10    relating to the plaintiff.

11         And the city had told us previously that they did not

12    have New York Police Department records in its possession,

13    although the city did say that they would search for these

14    documents and also provide us with a release, if one is needed,

15    and we have not received any documents or this release.

16         MR. TOEWS:  This is Mr. Toews, for the city.

17         Well, first of all, and I think contrary to what

18    plaintiff's counsel just stated and contrary to what's in the

19    motion or the letter, we never represented, and I would never

20    represent, that we don't have any NYPD records in our

21    possession.  Obviously, Corporation Counsel's office represents

22    the police department.  What we said in our response, we

23    objected because plaintiffs requested police records, and,

24    obviously, NYPD is not the only police force in New York State,

25    so we objected.  But, of course, we have NYPD records, the

M41KCITC

|     |                                                                 |
|-----|-----------------------------------------------------------------|
| 1   | police department does.  The last time we met and conferred     |
| 2   | about this, plaintiffs indicated they were looking for a        |
| 3   | missing persons report.  That's what I understood was at issue, |
| 4   | so this is the first -- the letter is the first I'm hearing     |
| 5   | that there were bullying complaints at a precinct.  So when we  |
| 6   | previously had discussed the missing persons report, we had     |
| 7   | indicated that this really wasn't -- it's not plaintiff's       |
| 8   | record, right, I think it was her father or somebody else filed |
| 9   | a missing persons report, so we had indicated that we -- NYPD   |
| 10  | had told us we may need an authorization to sort of retrieve    |
| 11  | the record.                                                     |
| 12  |          In terms of -- if it's complaints of bullying, I don't |
| 13  | object to doing a search for that.  It's not so simple, though, |
| 14  | as to just put plaintiff's -- tell the police department to     |
| 15  | look for anything related to plaintiff's name.  Again, I think  |
| 16  | pending plaintiff's deposition, if there's a particular         |
| 17  | complaint at a precinct that plaintiff is alleging that she     |
| 18  | made, if we have the date and the precinct, then I can          |
| 19  | certainly conduct a search for that.  I don't object to that.   |
| 20  | But, again, that was not what I understood was at issue here.   |
| 21  |          So, as I say, if plaintiff's counsel can provide, or   |
| 22  | maybe pending plaintiff's deposition, if we have a little more  |
| 23  | information about where the complaint was made and when, then I |
| 24  | don't object to asking NYPD to conduct a search for a complaint |
| 25  | report.                                                         |

M41KCITC

1          THE COURT:  All right.

2          Ms. Shimada, could you provide a little more

3    information?  It's pretty hard to find police department

4    records in that bureaucracy, but if you could provide more

5    information, I'll have Mr. Toews do another search.

6          MS. SHIMADA:  Yes, your Honor, we can do that.  I

7    believe there's actually a reference in the city's production

8    from the Connections files to them taking S.M. to a precinct to

9    file a report, but we can track down that date and send it to

10   Mr. Toews.

11         THE COURT:  Okay.  And then you'll provide that.

12         What do you all propose about depositions?  I'll hear

13   from plaintiff's counsel first.

14         MS. SHIMADA:  Your Honor, we have noticed, I believe,

15   six different depositions now, and we are waiting -- I guess

16   now that we understand that both defendants have said that they

17   have disclosed all relevant names, we can decide if we need any

18   more, but we think that the depositions we would like to take

19   need to happen after defendants have completed their

20   production.  So, depending on when defendants believe that they

21   would be able to complete the production we discussed today, we

22   think it would take us about another month and a half, and we

23   can finish all the depositions we've noticed.

24         THE COURT:  And defense counsel?

25         MR. RUTHERFORD:  This is David Rutherford.

M41KCITC

<pre>
 1              I have been trying to get the plaintiff's deposition
 2      for months now.  Plaintiffs have refused to give me a date for
 3      the deposition.  And I want to be clear that we want to depose
 4      the plaintiff first, that that's the first deposition that
 5      takes place.  Actually, I guess it's the plaintiff -- there are
 6      two plaintiffs, really, and I don't know what else to do other
 7      than I hate to involve the Court in things like scheduling a
 8      deposition, but plaintiff just refuses to respond to me.  This
 9      has gone on for months and months.  It's kind of an ancillary
10      issue to this.  Part of the delay was plaintiff's refusal to
11      give us any authorizations.  Like, for instance, her
12      psychotherapy records.  And that took several months for me to
13      arm-twist to finally get them to send me an authorization for
14      the Emma Bowen Center and also an authorization, a FERPA
15      authorization, to get the school records.  I now see, from this
16      authorization for records to be released that she sent to your
17      Honor, there, apparently, are records from Bellevue Hospital,
18      of which I never got an authorization.  And I think plaintiff
19      wants to get the records themselves and then distribute them to
20      us, but that's not the way this is done.  Any records, we
21      should receive an authorization.  Frankly, we should have
22      received an authorization in the automatic disclosures, but we
23      didn't.
24              So --
25              THE COURT:  You haven't gotten the records you need to
</pre>

M41KCITC

conduct plaintiff's deposition yet?

      MR. RUTHERFORD:  I haven't.

      But I do have the authorization, I processed the authorization, and I'm told the records are on the way from the Emma Bowen Center, and, also, we did get some school records. But I want to get the plaintiff's deposition scheduled. There's no way, obviously, we're going to meet this deadline for fact discovery at the end of the month, but I can foresee a refusal by the plaintiff to produce their client first, and I want to address it now with the Court, and I want some kind of commitment that the first deposition is going to be of the plaintiff.

      THE COURT:  I think that's the default approach, and I think that's the way it's going to be.

      The question is:  Are you ready to do it now, or do you want to wait for all the records?

      MR. RUTHERFORD:  I think we'll have all the records within the 30 days that the plaintiff has been talking about. I'm sure they want to see our records and review them with their client, but I think once we get through these 30 days, so that would bring us to May, I'm ready to do the deposition in May.

      THE COURT:  Okay.  So all these documents that are going to be produced in supplemental disclosures from Good Shepherd and the city will be due by the end of April.

M41KCITC

 1    Also, I expect plaintiff and defendants to have all the

 2    documents pursuant to any authorizations of plaintiff's

 3    information by the end of April.  Then depositions will take

 4    place in May and June, plaintiff first.

 5            I'm setting fact discovery at the end of June.  All

 6    the depositions will be done by the end of June.

 7            All right?  That's your marching orders.  And you will

 8    give me a status letter update — a status update — by the week

 9    after -- whatever a week is after the end of June.

10            Anything else for today from plaintiff?

11            MS. SHIMADA:  No, your Honor.  That's all we have.

12            THE COURT:  Thank you.

13            Anything else from the city?

14            MR. TOEWS:  No, your Honor.  Thank you very much.

15            THE COURT:  Anything else from Mr. Rutherford?

16            MR. RUTHERFORD:  Nothing else, your Honor.  Thank you.

17            THE COURT:  Okay.  Thanks, everyone.  We're adjourned.

18    Have a good weekend, everybody.

19            COUNSEL:  Thank you, your Honor.

20                              * * *

21

22

23

24

25